TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-07-00080-CR


NO. 03-07-00082-CR






Sidney Paul Sledge, Appellant



v.



The State of Texas, Appellee



&





NO. 03-07-00081-CR






Sidney Paul Sledge Jr., Appellant


v.



The State of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT


NOS. D-1-DC-05-500011, D-1-DC-04-500557 & D-1-DC-05-500040


HONORABLE MICHAEL LYNCH, JUDGE PRESIDING






O P I N I O N



Sidney Paul Sledge appeals two judgments of conviction for indecency with a child
by contact, in each of which the trial court assessed concurrent twenty-year prison terms, and
four judgments of conviction for aggravated sexual assault of a child, in each of which the
court assessed concurrent forty-year prison terms. See Tex. Penal Code Ann. § 21.11 (West 2003),
§ 22.021 (West Supp. 2007). In one of his three points of error, appellant contends that the trial
court erred by rendering more than one judgment on a single count. We will sustain this contention
and set aside one of the aggravated sexual assault convictions. We will overrule appellant's other
points of error, by which he challenges the factual sufficiency of the evidence and complains of the
admission of outcry testimony, and affirm the remaining convictions.


INDICTMENTS AND JUDGMENTS


Appellant was jointly tried on three indictments, each of which contained multiple
counts and paragraphs accusing him of aggravated sexual assault of a child, indecency with a
child by contact, and indecency with a child by exposure. At trial, the State abandoned all of the
indecency by exposure allegations and one of the indecency by contact allegations. The remaining
counts and paragraphs were submitted to the jury as they were alleged in the indictments.

The complainant in cause number D-1-DC-04-500557 was appellant's nine-year-old
daughter, J.S. (1) The counts and paragraphs submitted to the jury, and the jury's verdicts, were
as follows: 


Count one, paragraph one: penetration of the complainant's anus by appellant's
sexual organ. See Tex. Penal Code Ann. § 22.021(a)(1)(B)(i) (West Supp. 2007). 
Verdict: not guilty.


Count one, paragraph two: penetration of the complainant's sexual organ by
appellant's sexual organ. See id. Verdict: guilty.


Count one, paragraph three: causing the complainant's anus to contact appellant's
sexual organ. See id. § 22.021(a)(1)(B)(iv). Verdict: guilty.


Count two: touching the complainant's breast with the intent to arouse and gratify
appellant's sexual desire. See id. § 21.11(a)(1), (c)(1) (West 2003). Verdict: guilty.



The complainant in cause number D-1-DC-05-500011 was appellant's five-year-old
daughter, X.S. The counts and paragraphs submitted to the jury, and the jury's verdicts, were
as follows:


Count one, paragraph one: penetration of the complainant's sexual organ by
appellant's sexual organ. Verdict: not guilty.


Count one, paragraph two: causing the complainant's sexual organ to contact
appellant's sexual organ. See id. § 22.021(a)(1)(B)(iii) (West Supp. 2007). Verdict:
guilty.


Count two: touching the complainant's genitals with the intent to arouse and gratify
appellant's sexual desire. Verdict: guilty.



The complainant in cause number D-1-DC-05-500040 was appellant's seven-year-old
son, E.S. The counts and paragraphs submitted to the jury, and the jury's verdicts, were as follows:


Count one: penetration of the complainant's anus by appellant's sexual organ. 
Verdict: guilty.


Count two, paragraph one: touching the complainant's anus with the intent to arouse
and gratify appellant's sexual desire. Verdict: not guilty.


Count two, paragraph two: touching the complainant's genitals with the intent to
arouse and gratify appellant's sexual desire. Verdict: not guilty.



The district court rendered a judgment of conviction on each count and paragraph for
which there was a verdict of guilt. In point of error two, appellant contends that the court erred in
cause number D-1-DC-04-500557 by rendering judgments of conviction on both paragraph two and
paragraph three of count one. We agree.

If the State wishes to allege several different offenses in a single indictment, it
must allege each offense in a separate count. Tex. Code Crim. Proc. Ann. art. 21.24(a) (West 1989). 
Within each count, the State may allege in separate paragraphs different methods of committing
the same offense. Id. art. 21.24(b). Because a count alleges a single offense, an indictment cannot
authorize more convictions than there are counts, and there can be only one conviction per count. 
Martinez v. State, 225 S.W.3d 550, 554 (Tex. Crim. App. 2007). In Martinez, the court of criminal
appeals held that the trial court erred by rendering judgments of conviction on two paragraphs within
a single count of the indictment. (2) Id. at 555. This Court recently followed Martinez and held that a
trial court erred by rendering judgments of conviction on two paragraphs in one count and on
three paragraphs in a second count. (3) Fowler v. State, 240 S.W.3d 277, 281 (Tex. App.--Austin
2007, pet. ref'd).

The State seeks to distinguish Martinez, noting that the defendant in that case
objected to the jury charge on the ground that it submitted more than one paragraph per count. See
Martinez, 225 S.W.3d at 552-53. The State urges that because appellant did not similarly object
in this case, the trial court was authorized to impliedly "amend" the indictment by treating
the paragraphs as if they were separate counts. (4) The State cites article 28.10, which permits the
amendment of an indictment after trial begins if the defendant does not object. Tex. Code Crim.
Proc. Ann. art. 28.10(b) (West 2006). Article 28.10 does not apply here, however, because the
indictment was not actually amended. The State cites no authority, and we are aware of none,
holding that article 28.10 permits a trial court to impliedly amend an indictment, whether by
rendering more than one judgment of conviction on a single count or otherwise.

Martinez does not support the State's argument. First, the error identified in Martinez
was not the trial court's submission to the jury of more than one paragraph per count. See Martinez,
225 S.W.3d at 555. Rather, after the jury returned its verdicts, the court erred by rendering judgment
on more than one paragraph per count. See id. Thus, in the causes now before us, appellant's failure
to object to the jury charge is irrelevant because the error did not occur until after the charge was
given, the verdicts were returned, and the judgments of conviction were rendered. (5) Second, Martinez
expressly states that a trial court may not impliedly amend an indictment by treating paragraphs as if
they were counts. See id. at 554. For a trial court to render judgment on multiple paragraphs within
a single count as if they were separate counts alleging different offenses violates both the defendant's
due process right to notice of the charges against him and his constitutional right to grand jury
screening of those charges. See id.

The State also cites this Court's opinion in Patterson v. State, in which we held that
the trial court did not err by authorizing the defendant's conviction under both paragraphs of a single
count. 96 S.W.3d 427, 433-34 (Tex. App.--Austin 2002), aff'd, 152 S.W.3d 88, 92 (Tex. Crim.
App. 2004). Insofar as Patterson holds that a trial court may submit more than one paragraph of a
count to the jury, it is consistent with Martinez. But insofar as Patterson holds that a trial court may
treat paragraphs as if they were counts and may render judgment of conviction on more than one
paragraph of a single count, it is contrary to Martinez and should be considered overruled.

By alleging the three sexual assaults as paragraphs under a single count rather than
as three separate counts, the State in cause number D-1-DC-04-500557 gave appellant notice that
he risked only one conviction for aggravated sexual assault and effectively limited itself to only
one aggravated sexual assault conviction. (6) After the jury returned verdicts convicting appellant on
paragraphs two and three, the trial court erred by rendering judgment on both paragraphs because
the law permits only one conviction per count in the indictment. See id. at 555. The error was
not harmless because appellant was convicted of more offenses than were authorized by law. See
id. The remedy is to set aside one of the two judgments of conviction under count one. See id. 
Accordingly, we will reverse the judgment of conviction on count one, paragraph three.

EVIDENCE


In his first point of error, appellant contends that the evidence is factually insufficient
to sustain the guilty verdicts. When there is a challenge to the sufficiency of the evidence to sustain
a criminal conviction, the question presented is whether a rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307,
324 (1979) (legal sufficiency); Clayton v. State, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (legal
sufficiency); Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000) (factual sufficiency). In
a factual sufficiency review, all the evidence is considered equally, including the testimony of
defense witnesses and the existence of alternative hypotheses. Clewis v. State, 922 S.W.2d 126, 129
(Tex. Crim. App. 1996); Orona v. State, 836 S.W.2d 319, 321 (Tex. App.--Austin 1992, no pet.). 
The evidence will be deemed factually insufficient if the evidence supporting the verdict is so weak
as to make the finding of guilt clearly wrong or manifestly unjust, or if the verdict is against the great
weight and preponderance of the available evidence. Watson v. State, 204 S.W.3d 404, 414-15
(Tex. Crim. App. 2006); Johnson, 23 S.W.3d at 11.


Background

Appellant, who is also known as "Kirby," and his wife, Cristy Sledge, have five living
children: the three complainants, J.S., E.S., and X.S., and their two younger siblings, S.S. and R.S. 
A sixth child, referred to as "baby Kirby," was stillborn. During 2003, the family was living in a
trailer on property owned by appellant's mother, Mary Sledge. Mary and appellant's father lived in
a second trailer on the property, while a third trailer was the residence of appellant's sister and her
family. During 2004, appellant, Cristy, and the children moved to a white house about two blocks
from the Sledge property.

Child Protective Services workers began an investigation into the welfare of
appellant's children in 2002. In early 2003, a CPS investigator prepared a report finding no evidence
of physical abuse or neglect and reporting no evidence of sexual abuse. CPS workers returned to the
Sledge property in September 2003. When they arrived, Cristy and the children fled into the nearby
woods. Although the children were soon returned to the residence, appellant loaded them into a van
and drove away before they could be interviewed. One of the investigators testified that the trailer
in which appellant and his family were then living had no running water and non-functional toilets. 
The trailer had holes in the floor and was infested with roaches, and there were puddles of urine
throughout the premises. CPS obtained temporary managing conservatorship of appellant's children
in September 2004 and took physical custody of them in October 2004. The children were initially
placed in a shelter. In November 2004, all five children were placed in a foster home.

The foster parents were Tracy and David Conti. The Contis testified that the three
complainants were developmentally behind their age groups. For example, Tracy said that J.S., who
was then nine, "did not know how to shower, did not know how to take a bath, did not know how
to use soap, shampoo, she did not know how to wipe when she would go to the bathroom." More
than once, J.S. smeared feces around the bathroom and on her body. Similarly, David testified that
he had to teach E.S., who was seven, "how to wash up and bathe himself." E.S. also urinated on the
bedroom floor. When eating, the children would "shove food into their mouth[s] so full that it would
fall out." They also hoarded food, hiding it under their beds.

Tracy testified that the children engaged in inappropriate touching. She said, "There
would be times, slap butts or hug[s], and they would get face-to-face, mouth-to-mouth, so we would
have to correct some of those issues." Tracy said that J.S. would "act out" sexually: "She had a
real--she would lick her lips or her teeth and she would get her--she would just have a look on her
face, if it were--." J.S. behaved in this manner only in front of men. Tracy also described J.S.'s
unusual doll play: "We had Barbie dolls, Barbie dolls were having sex. The man was--his head was
between the Barbie doll's legs." Tracy testified that this happened more than once.


Outcries

J.S. was the first child to make an outcry regarding sexual abuse. David Conti
testified that he and Tracy took J.S. to a doctor's appointment on November 29, 2004. During the
trip, J.S. told them that "her dad had put his private area," which she called a "dido," in her
"monkey," which was her term for her vagina. She reported that this had happened on more than
one occasion and that it hurt. According to David, J.S. also said that "he would put it in her butt and
that it would make her cry. She would tell him it would hurt but he would keep doing it until he was
done." J.S. said that "she knew that . . . her dad was done [when] he wasn't making any more ah ah
noises." She added, "He would make a loud noise and then there would be a hard push and then
he would stop and then he would pull it out and tell her to put her clothes on." J.S. also told the
Contis that she had heard her father having sex with X.S. David testified that J.S. said "she
knew [X.S.] had had sex because she heard them." J.S. told David that she heard them "making the
ah ah noises."

J.S. made a second outcry on December 2, 2004. On this occasion, she was in the car
with Tracy Conti and X.S. Tracy testified, "She was telling us that her dad had touched her on her
boobs and that he also had put his . . . dido . . . in her monkey and that it was uncomfortable, and
then she said but it wasn't as uncomfortable as when her dad put it in her butt and that she wasn't
to tell anybody that." Tracy said that J.S. said that this had been going on "since they lived in the
camper and another house, several different homes."

That same night, the Contis found X.S. crying during their evening bed check. They
brought her to the living room and, after some hesitation, she told them that "her dad had touched
her in her private area." Tracy testified, "She was crying, talking about her dad touching her in her
private area, that she would have her go under the covers and he would get behind her, pull her pants
down, pull his pants down and put it in her butt . . . ." Tracy went on, "She also said that he would
pull his pants down, pull her pants down, and he said he did this to all four year olds at least once. 
She said daddy put his pee pee in her pee pee and she cried." According to Tracy, X.S. said that
when this happened, her dad made "the oh and the ah, ah and those noises." X.S. also described
seeing "a green substance she said that came out, sometimes it was a yellowish white she said or a
green substance."

E.S. made his first outcry to the Contis on January 2, 2005. David testified that he
and E.S. were sitting at the dining table and E.S. "was very upset." David added, "I remember tears
were rolling down his face as he was talking about things that had happened to him, and then [E.S.]
said that his dad had had sex with him, he said his dad would put his penis in his butt. He said that
when he was done, he would have drops of yellow white stuff on him and he said his dad would have
him lay on his stomach." E.S. told David that he got the "yellow white stuff in his mouth and legs
and chest. He said it tasted like honey oil. It was nasty and dad told him to swallow it." E.S. also
told David that his parents took pictures of him, J.S., and E.S. performing sex acts.


Interviews and Examinations

The Contis reported each outcry to CPS. CPS, in turn, notified the police and
arranged for the children to be interviewed at the Center for Child Protection. Forensic interviewer
Betzabel Burciaga testified that she interviewed J.S. on December 2, 2004, and X.S. on December
6, 2004. Burciaga testified that both girls reported being sexually assaulted by their father. Burciaga
interviewed the girls a second time in January 2005, after each made outcries regarding sexual abuse
by their grandfather. (7) These interviews were recorded on videotape, and edited versions were
introduced in evidence and played for the jury.

Forensic interviewer Cyndi Cantu first interviewed E.S. on December 8, 2004, before
he made his initial outcry. (8) She interviewed him a second time on January 5, 2005, following his
outcry to the Contis. Cantu did not describe E.S.'s statements during this second interview but, like
the other interviews, it was recorded and the recording was shown to the jury.

Each complainant was examined by Dr. Beth Nauert, a pediatrician with expertise
in child sexual abuse cases. Nauert testified that J.S. told her during the examination that "her father
would put his diddle, which is what she called a penis, into her vagina and her rectum." J.S. was
unclear on the time frame, but told the doctor that this happened on multiple occasions. Nauert
testified that X.S. told her that "her father touched her vaginal area on top of her clothes." E.S. told
Nauert that his father "put his thing in [his] bottom. Orange stuff came on my body." E.S. also told
the doctor about other incidents of sexual abuse by his mother and several cousins. Nauert testified
that her physical examinations of the children were normal and, although they were not inconsistent
with the reported abuse, they did not confirm it.


Complainants' Testimony

J.S. testified that her parents were Kirby and Cristy Sledge. She testified that her dad,
or Kirby, touched her "boobies" with his hands and put his "dick" inside her "hooch" and her "butt." 
She testified that this happened more than once, at both the trailer and the white house. J.S. testified
that her mother saw appellant touching her and took photographs. She also said that her grandfather
had touched her "hooch" with his hands. J.S. often contradicted herself. For example, she said that
she had always told the truth about her parents, but she later said that she lied when she told Burciaga
that her mother had touched her genitals. She also made contradictory statements regarding whether
or not she had seen appellant having sex with X.S. J.S. had not seen appellant for two years and
could not identify him in court. She identified State's exhibit six, a photograph of appellant taken
two years earlier, as her father, Kirby Sledge. J.S. also testified about the death of "baby Kirby." She
said that he "came out of my mama's stomach wrong." She also testified, however, that she saw
"baby Kirby" fall from the top of a bunk bed and hit the floor. She said that when this happened,
"there was blood coming down."

X.S. testified that her father, who she also called Kirby, touched the inside of her
"coochie" with his fingers and put his "ding dong" inside her "butt." She also contradicted herself,
saying later that appellant did not touch her "coochie" and always kept his "ding dong" covered. 
X.S. was also unable to identify appellant at trial. She identified State's exhibit six as a photograph
of her father, Kirby Sledge, and agreed that it showed "how Kirby looked the last time [she] saw
him." During cross-examination, X.S. acknowledged that she did not always tell the truth to
the persons she talked to, but she said that she could not remember who she lied to. She also
remembered "baby Kirby" falling from the bed and cracking his head, although she said that she did
not see this happen.

E.S. testified that his father, Kirby Sledge, touched his "front part" and his "back part"
with his hand. E.S. also testified that appellant's "front part" touched his "back part." He said this
happened more than once. E.S. remembered telling the Contis that "Kirby put his front part inside
[E.S.'s] back part" and said that this statement was true. E.S. said during cross-examination that he
put his "thing" in his father's "back side." Like his sisters, E.S. was unable to identify appellant at
trial, but identified State's exhibit six as a photograph of his father, Kirby Sledge.

E.S. testified that someone he did not identify took pictures of him and his sisters
while they were naked. He also said that Cristy and his "grandpa" touched him. E.S. initially
testified that he never saw anything happen to J.S. or X.S., but he said during cross-examination that
he had seen Kirby doing "bad stuff" with X.S. Also during his cross-examination, E.S. recalled
telling the Contis that Kirby and Cristy had sex with his grandfather and grandmother. He said that
he thought this happened because J.S. told him that it did.

Other Testimony

Detective Gerald Kim testified that he investigated the complainants' statements that
they had been photographed while engaged in sexual activities. He said that he found no evidence
to confirm these statements. He added that all commercial photo developers contact the police when
they encounter child pornography.

Both the State and the defense called an expert witness. The State's expert was
psychologist William Lee Carter. Carter testified that in assessing the credibility of a child's outcry,
he considers whether the child's later statements are consistent with the initial outcry. He also
considers "whose idea is it to tell." That is, did the child volunteer the information or was the child
prompted by an adult. Carter also looks for "sensory detail"--descriptions of the details of sexual
acts that would not normally be within the child's experience. Carter said that "[t]he world that these
abused kids come from is so chaotic that the stories that they tell are also sometimes chaotic and you
can't make sense of them."

Carter also explained that children who are sexually abused by a parent or some other
authority figure will commonly not make an outcry until they are placed into a new living situation
and have had time to develop a sense of trust in their new care givers. Carter testified that children
who are sexually abused are often neglected in other ways, and as a result they will display bad
manners, a lack of hygiene, and other behavioral problems.

The defense expert was psychologist Matthew Ferrara. Ferrara testified that the
younger the child, the more prone the child is to making a false outcry. He added that a child who
is developmentally disabled will be less mature than his or her biological age and thus more likely
to make a false accusation. Ferrara also described the danger of implanting false memories in young
children through repeated interviews and the use of leading questions. Ferrara criticized the use of
anatomically correct dolls, as had been used by the forensic interviewers in these cases, saying that
recent studies show that such dolls "actually suggest to a child what should be done or could be
done" and hence increase the likelihood of a false statement.

Two other defense witnesses--a family friend and appellant's sister--testified that
J.S. had a vivid imagination, would fantasize, and was dishonest. Appellant's half brother testified
that he had never seen any pornographic photographs of appellant's children.


Discussion

By challenging only the factual sufficiency of the evidence, appellant effectively
concedes that the evidence in these causes is legally sufficient to sustain his convictions. See Clewis,
922 S.W.2d at 134. Nevertheless, appellant urges that when all the testimony is considered equally,
the evidence of guilt is so weak and so contrary to the great weight of the contrary evidence as
to make his convictions manifestly improper. The essence of appellant's argument is that the
complainants' outcry statements and trial testimony were not credible.

Appellant argues that the complainants had two motives to falsely accuse him
and his wife of sexual misconduct. First, appellant suggests that the complainants were emotionally
distraught and angry with their parents over the death of their younger brother, "baby Kirby." 
Appellant notes that although it was undisputed that the child was stillborn at the hospital, both J.S.
and X.S. claimed to have seen the child at their home and remembered him falling from his bed. 
Appellant urges that the children's accounts of their sexual abuse at the hands of appellant and other
family members was similarly fanciful.

Appellant suggests that the complainants were further motivated to make false
accusations because they did not want to return to their natural family. He bases this argument on
the evidence describing the filthy conditions in which the children were living, their lack of
nourishment, and their developmental problems. He also points to the Contis' testimony describing
the many gifts the children received while in their care. He notes that X.S. testified that she told the
Contis about the "bad touches" "[s]o [she] could have a good life."

As further evidence of the complainants' lack of credibility, appellant cites their trial
testimony: the difficulty they had in recalling events, the inconsistent statements, and the admissions
that they had made false statements in the past. Appellant also notes that in the journal she kept
while the complainants were living with her, Tracy Conti wrote that J.S. "lies so much it is very hard
to believe her with anything" and that J.S. "could lie with a serious face and at the same time swear
she didn't lie." Conti testified, however, that those remarks referred to incidents of misbehavior in
the home and not to J.S.'s sexual abuse outcries. Appellant also claims that E.S. was malleable and
suggestible, and simply repeated what J.S. told him. He argues that E.S.'s accounts became more
grandiose and fantastic as his testimony proceeded. Appellant points out that there was no physical
evidence of sexual abuse, and he also draws attention to the fact that the complainants were unable
to identify him at trial.

Appellant argues that there was a strong likelihood that the complainants had
developed false memories concerning the alleged abuse. Each of the complainants was interviewed
more than once at the Center for Child Protection, and the children were also shown to have
collectively discussed their outcries with each other and with the Contis. Tracy Conti testified,
however, that the group discussions in their home took place only after the children were
individually interviewed on videotape at the center. The forensic interviewers testified that
the children were never interviewed twice about the same subject; each interview related to a
different matter. Appellant's argument also does not account for the complainants' outcry statements
to their foster parents, which were as vivid and detailed as their trial testimony was vague and
inarticulate. Although appellant attempted to show that the complainants had seen sexually explicit
movies on cable television, the trier of fact could reasonably conclude that the details contained in
the outcry statements were strong evidence that the complainants were describing events that they
had actually experienced.

When conducting a factual sufficiency review, we must give due deference to the
jury's determinations, particularly those concerning the weight and credibility of the testimony
and other evidence. Johnson, 23 S.W.3d at 9; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App.
1997). The jurors in these causes were able to watch the complainants as they testified and were in
the best position to decide whether they were frightened children doing their best to accurately
describe horrible events two or more years in the past, or confused children who had been misled
(inadvertently or otherwise) into making false accusations, or simply liars. The four not guilty
verdicts demonstrate that the jurors were prepared to find appellant not guilty if they believed that
an accusation was not proved. Considering all the evidence equally, we hold that the evidence
supporting the guilty verdicts is not so weak or so against the great weight and preponderance of the
other evidence as to make the findings of guilt clearly wrong or manifestly unjust. Point of error one
is overruled.


OUTCRY STATEMENTS


In his last point of error, appellant urges that the trial court erred by admitting
the complainants' outcry statements to the Contis because the defense was not given the notice
required by statute. See Tex. Code Crim. Proc. Ann. art. 38.072 (West 2005). Broadly speaking,
article 38.072 exempts from the hearsay rule sexual abuse outcry statements made by children twelve
years of age or younger. One requisite for the admission of an outcry statement is that the offering
party notify the adverse party at least two weeks before trial begins Id. art. 38.072, § 2(b)(1). 
Appellant argues that the State did not satisfy this notice requirement because no article 38.072
notice appears in the clerk's records.

The only relevant objection voiced by appellant during the trial came during
Tracy Conti's testimony. When the prosecutor asked her to relate the outcry statement J.S. made to
the Contis during the trip to the doctor, which the record elsewhere shows was on November 29,
2004, defense counsel approached the bench and said:


MR. FOX: From my memory and my notes, the outcry notice I got was from
David Conti and the initial outcry, and hers was a--was a subsequent outcry. First
outcry is to the father. Can they establish the date that this happened? I wasn't given
notice of this.


MS. MCFARLAND: I can do it through David. They were both there.


MR. FOX: I don't know what she is going to say since I haven't been given
notice of it.


MS. MCFARLAND: That's fine.


MR. FOX: We can remove the jury.


MS. MCFARLAND: No, that is fine.



Resuming her questioning, the prosecutor asked Tracy to describe the outcry statement J.S. made
on December 2, 2004, which she did without further objection by the defense. The November 29,
outcry statement was later introduced through David Conti's testimony.

This recitation from the record demonstrates that defense counsel was aware of the
November 29, statement, but had been notified that it would be offered through David Conti rather
than Tracy Conti. Appellant cites no authority holding that the notice required by article 38.072
must be filed and made a part of the clerk's record, although that might be the better practice. The
record also demonstrates that rather than forcing the issue, the prosecutor wisely chose to wait
and, consistent with the notice given to the defense, introduce the November 29, statement through
David Conti.

The defense did not object to any other outcry testimony based on a lack of proper
notice. The comments of counsel quoted above show that notice of the outcry statements was given. 
No error is presented. Point of error three is overruled.


CONCLUSION


In cause numbers D-1-DC-05-500011 and D-1-DC-05-500040, the judgments of
conviction are affirmed. In cause number D-1-DC-04-500557, the judgments of conviction on count
one, paragraph two and count two are affirmed, but the judgment of conviction on count one,
paragraph three is reversed and the prosecution of that paragraph is dismissed. 



 __________________________________________

 W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Waldrop and Henson

Affirmed in part; Reversed and Dismissed in part

Filed: August 19, 2008

Publish
1. We state the complainants' ages as of the offense date alleged in the indictments. The
complainants were two years older at the time of appellant's trial.
2. The two paragraphs alleged separate indecency with a child offenses--touching the
complainant's breast and touching the complainant's genitals--for which the defendant could have
been convicted had they been alleged in separate counts. See Pizzo v. State, 235 S.W.3d 711, 719
(Tex. Crim. App. 2007).
3. Once again, the paragraphs alleged distinct offenses for which the defendant could have
been separately convicted had they been alleged as counts.
4. The State concedes that there was no objection to the charge in Fowler. See Fowler
v. State, 240 S.W.3d 277, 279-80 (Tex. App.--Austin 2007, pet. ref'd). The State notes, however,
that it did not advance its "implied amendment" argument in that case.
5. The State does not contend that appellant's failure to object below waived the error he
asserts. Because Martinez holds that a trial court is not legally authorized to render more than one
judgment of conviction per count, the State reasons that if the indictment was not impliedly amended
(and we hold that it was not), the second and any subsequent judgment on a single count is void. See
Nix v. State, 65 S.W.3d 664, 667-68 (Tex. Crim. App. 2001).
6. The same can be said for count one in cause number D-1-DC-05-500011 and count two
in cause number D-1-DC-05-500040. In those causes, however, the jury's verdicts mooted the issue.
7. Burciaga testified that she conducted a third interview of J.S. This interview concerned
statements that J.S. made regarding the death of "baby Kirby," a subject we will address later in
this opinion.
8. This interview also related to "baby Kirby."